## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 23 2019, 11:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Termination of the Parent-Child Relationship of:


K.I.N.G., (Minor Child),

    And

V.G. (Father),

*Appellant-Respondent,*

     v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 23, 2019

Court of Appeals Case No.
19A-JT-1163

Appeal from the St. Joseph Probate Court

The Honorable Jason A. Cichowicz, Judge

The Honorable Graham Polando, Magistrate

Trial Court Cause No.
71J01-1806-JT-105

**Altice, Judge.**

## Case Summary

V.G. (Father) appeals from the involuntary termination of his parental rights to his daughter, K.G. (Child). He challenges the sufficiency of the evidence supporting the termination order. [1]

We affirm.

## Facts & Procedural History[2]

Child was born to Mother and Father on January 5, 2017. The family struggled with chronic housing instability and had been timed out at multiple homeless shelters. On August 16, 2017, they were put out of a motel in which they were staying for nonpayment. Mother and Father then allegedly slept in the woods with Child for two days, which resulted in a report of child neglect to the Indiana Department of Child Services (DCS) on August 18, 2017.

Krysten Saxton, an assessment worker with DCS, investigated the report that same day. Mother and Father acknowledged that they had nowhere to live and were both unemployed. Saxton observed that Child was dirty and "had a foul

---

[1] K.G.'s mother's rights were also terminated, but P.L. (Mother) does not participate in this appeal. Accordingly, our focus will be on the evidence related to Father and his relationship with Child.

[2] We feel compelled to observe that the paltry statement of facts section provided by appellate counsel in Father's brief is wholly inadequate. The deficiency is glaring and unacceptable. Counsel is directed to review the requirements of Ind. Appellate Rule 46(A)(6) before filing another brief with this court.

smell." *Transcript* at 53. Upon changing Child's diaper, Saxton discovered Child had a "very severe … diaper rash that resembled a chemical burn." *Id*. Saxton detained Child on an emergency basis and sought medical care for her. Child was placed in foster care and has never been returned to Mother or Father's care.

[5] On August 21, 2017, DCS filed a petition alleging Child to be a child in need of services (CHINS) due to parents being homeless and unable to properly care for her. That same day, Father submitted to a random drug screen that returned positive for THC. Thereafter, on September 7, 2017, the trial court adjudicated Child a CHINS. Pursuant to the dispositional order issued October 5, 2017, Father was ordered to notify the family case manager (FCM) of changes in address and of any arrests or criminal charges, enroll in programs recommended by DCS service providers and keep all appointments, maintain suitable, safe, and stable housing, maintain stable income, participate in homebased case management, obtain a psychological parenting assessment, and attend all scheduled visits with Child. Further, to address Father's illegal drug use, the court ordered him to complete a substance abuse assessment, follow treatment recommendations, and submit to random drug screens.

[6] Bridget Bramlett has been the FCM assigned in this case since August 24, 2017. Throughout the CHINS proceedings Father did not maintain contact with FCM Bramlett. She was able to talk with him only once, when she stopped in during a supervised visit in December 2017. At that point, Father provided her with an updated address, but he moved other times during the proceedings and

did not notify FCM Bramlett. Father also failed to inform her of arrest warrants issued out of Marion County and St. Joseph County. Regarding the latter, Father was charged in November 2017 with two counts of child molesting (with his niece and nephew as victims) and arrested on those charges on January 4, 2018. He has been incarcerated ever since and ultimately pled guilty in March 2018 to both counts. Father received a ten-year sentence with six years suspended and has a current release date in October 2020.

[7] Prior to his incarceration, Father made some progress with services. Father participated in a substance abuse assessment with Emily Sussman on October 16, 2017. He tested positive for THC on that date and admitted to being a regular marijuana user since a young age. Sussman recommended that Father participate in a modified intensive outpatient program, but Father never enrolled in the program despite two different opportunities. Additionally, Father initially worked with a homemaker services provider to open a bank account, maintain part-time employment,[3] and start budgeting. This referral, however, was closed after Father missed too many sessions with the service provider. FCM Bramlett described Father's participation in homebased services as "[v]ery sporadic[]." *Id.* at 69.

[8] Father was inconsistent with supervised visitation from the start, attending only about three visits over the first two months. The visitation supervisor during

---

[3] According to Father, between September 2017 and early January 2018, he worked about eight hours per week at Goodwill and four to six hours per week for Little Caesars.

this time, Sheila Thiabat, testified that Father generally did not attend, but when he did, he spent a lot of time on his phone not interacting with Child. Mother and Father also argued during at least one of these visits, causing Thiabat to cut the visit short. By early November, Mother and Father had to have separate visits with Child to avoid conflict, and a new visitation supervisor took over for Child's visits with Father. In November and December, Father attended only about half of the scheduled visits, and he did not come prepared with adequate supplies for Child, such as baby formula, diapers, and wipes. Father testified that he missed visits because he was "preoccupied" and working about fourteen hours per week. *Id*. at 167. Father has not seen Child since his arrest in January 2018.

[9] FCM Bramlett went to speak with Father at the county jail before he was transported to prison. Father indicated that "his goal after he was done with prison was that he was going to get out and stay with a friend and then attempt to get his daughter back." *Id*. at 69. FCM Bramlett attempted to obtain services for Father in prison but found that he was ineligible or that service providers were unavailable to come to the prison.

[10] On April 5, 2018, the trial court modified the dispositional decree to provide for concurrent plans of reunification and adoption. Following a hearing on August 16, 2018, the trial court changed the plan to adoption, which was recommended by the CASA and DCS.

[11] In the meantime, on June 19, 2018, DCS filed a petition for the involuntary termination of the parent-child relationship between Child and Father and Mother. An amended petition was then filed on August 15, 2018. Evidence was heard in the termination hearing on December 4, 5, and 11, 2018.

[12] DCS presented evidence, as set out above, showing that Father made no real progress with services in the months before his incarceration. He did not obtain stable housing, he was employed on only a very part-time basis, he did not stay in contact with the FCM, he never took a psychological parenting assessment, he was inconsistent with and unprepared for supervised visits, sporadic with homemaker services, and, though he completed a substance abuse assessment early in the CHINS case, he never followed up with treatment recommendations. Since being incarcerated, he has not seen Child or made any progress with services and is not scheduled to be released from prison for at least another year. Additionally, Father has now been convicted of molesting both his niece (committed in 2016) and nephew (committed in 2012 or 2013).

[13] FCM Bramlett and the CASA both testified that termination of parental rights was in Child's best interests. The CASA opined that Mother and Father were unable to provide for Child's basic needs and emotional support. The CASA explained that early in the CHINS case Child was "very withdrawn", would not interact with caregivers, and cried if not left alone. *Id*. at 123. Similarly, FCM Bramlett testified that, in addition to her physical ailments, Child came into foster care at nearly eight months old with "a general … fear [of] the people around her." *Id*. at 71. After being in the foster mother's care for over a

year at the time of the termination hearing, however, Child was active and thriving both emotionally and physically. Child had a "very strong bond" with her foster mother, who expressed a desire to adopt Child. *Id.*

[14] On February 9, 2019, the trial court issued the termination order from which Father now belatedly appeals after obtaining leave from this court. Additional information will be provided below as needed.

## Discussion & Decision

[15] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[16] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for

the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[17] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. Among other things, DCS must also allege and prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C); I.C. § 31-37-14-2.

[18] On appeal, Father asserts that DCS failed to present clear and convincing evidence that the conditions resulting in Child's removal would not be

remedied, that the continuation of the parent-child relationship poses a threat to Child's well-being, and that termination is in Child's best interests. We will address each of these in turn, as needed.

[19] Father first contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in Child's removal or continued placement outside Father's care will not be remedied. In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id*. The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. "Also, the failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d

366, 372 (Ind. Ct. App. 2007) (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)), *trans. denied*.

[20] The record establishes that the reasons for Child's removal and continued placement outside Father's care centered on his unstable lifestyle and inability to properly care for Child. At the time of removal, Father (as well as Mother) was unemployed and homeless. The family had suffered from chronic housing instability for some time and had been timed out of shelters. In addition to having no home, Father failed to provide other basic care for Child. At seven months old, Child was suffering from severe, untreated diaper rash and was smelly, dirty, and underweight. Shortly after Child's removal, DCS also discovered that Father had a history of regular marijuana use. In the dispositional order, the court attempted to address these issues by ordering services to help Father regarding parenting, housing, employment, and living free of illegal substances.

[21] Father made little progress over the life of the CHINS case and did not maintain contact with the FCM. Before his incarceration, Father never obtained suitable housing, instead moving between the homes of his two brothers. While he did work two jobs for several months, his own testimony reveals that they totaled only about fourteen hours of work per week. Father acknowledged that in the months leading up to his incarceration, he "never really got around to" taking a psychological parenting assessment and missed supervised visits because he was "preoccupied." *Id*. at 162, 167. In addition to missing more than half of the scheduled visits with Child, Father would come

unprepared and spend much of the visit looking at his phone. Father was unsuccessfully discharged from homebased services on more than one occasion and, although he completed a substance abuse assessment, he never followed up with treatment recommendations despite multiple opportunities.

[22] Father has been incarcerated since January 2018, around Child's first birthday. He has not seen her since his incarceration for child molesting and will not be released until October 2020, when Child will be nearly four years old. Father has not enrolled in any programs while incarcerated to address the reasons for Child's removal from his care.

[23] In sum, Father was in no better position to parent Child at the time of the termination hearing than he was when Child was removed from his care. He did not display any ability to secure adequate housing, he failed to stay in contact with and cooperate with DCS to complete court-ordered services, and he did not consistently engage in supervised visits with Child. Father put forth minimal effort toward regaining custody of Child in the months leading up to his incarceration and none thereafter. The evidence and the court's findings of fact overwhelmingly establish a reasonable probability that the conditions resulting in Child's removal and continued placement outside Father's care will not be remedied. *Cf. K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 649 (Ind. 2015) (reversing termination order where incarcerated father made "substantial efforts … to improve his life by learning to become a better parent, establishing a relationship with [his children], and attending substance abuse classes" and "there [was] seemingly nothing else that [he] could have been

doing to demonstrate his dedication to obtaining reunification"); *In re R.J.*, 829 N.E.2d 1032, 1038 (Ind. Ct. App. 2005) (reversing termination order where father "obtained steady employment and a one bedroom apartment, completed parenting classes, substance abuse counseling, and psychological evaluations, and maintained regular visitation" and there was "no indication of [his] unwillingness to cooperate with the OFC or that he failed to promptly complete any of the OFC's programs").

[24] I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, having upheld the trial court's conclusion under I.C. § 31-35-2-4(b)(2)(B)(i), we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to Child's well-being.

[25] Finally, Father asserts, with little to no analysis, that the evidence was insufficient to support the trial court's determination that termination was in Child's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-

appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[26] Here, both the CASA and the FCM opined that termination was in Child's best interests. In making this same conclusion, the trial court observed:

> The Child herself presents persuasive evidence of her own best interests. Upon placement in foster care, the Child was abnormally quiet, failing even to babble. The Child did not want to be touched, and was underweight. This weight-related condition was likely due to Mother's inability to feed the child age-appropriate foods, a deficiency she demonstrated during the rare occasions when visits did occur. And finally, and most notably, there was, as above, the "chemical burn"-type diaper rash.
>
> After being in her current foster home, the Child is now an appropriate weight, and is "running around playing now."

*Appendix* at 79. Child is indeed thriving in the home of her foster mother, with whom she has lived since August 21, 2017. Child has not seen Father since January 2018, when she was one year old, and he will not be out of prison until she is nearly four years old. Under the circumstances, especially considering that the conditions resulting in removal are not likely to be remedied by Father, termination of parental rights is in Child's best interests.

Judgment affirmed.

Brown, J. and Tavitas, J., concur.